J-S33001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF K.Q., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.Q., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 230 MDA 2019 |

Appeal from the Decree Entered January 11, 2019
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  106-Adopt-2018

BEFORE:  LAZARUS, J., OTT, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY LAZARUS, J.:  **FILED JULY 08, 2019**

K.Q. (Mother) appeals from the trial court's decree involuntarily terminating her parental rights to her minor son, K.Q. (born 3/2016). Mother's counsel has also filed an ***Anders***/***McClendon***[1] brief seeking to withdraw from representing her on appeal.[2]  After careful review, we affirm based on the trial court's opinion and grant counsel's petition to withdraw.[3]

---

[1] ***Anders v. California***, 386 U.S. 738 (1967); ***Commonwealth v. McClendon***, 434 A.2d 1185 (Pa. 1981).

[2] ***See In re V.E.***, 611 A.2d 1267 (Pa. Super. 1992) (extending ***Anders*** briefing requirements to termination of parental rights appeals involving indigent parents represented by court-appointed counsel).

[3] Child was represented by guardian *ad litem*, Marylou Matas, Esquire, and attorney, Damian J. DeStefano, Esquire, at the termination hearing. ***See*** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and ***In re K.R.***, 200 A.3d 969 (Pa. Super. 2018) (en banc), ***but see In Re: T.S., E.S.***, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings,

Cumberland County Children and Youth Services (CYS) received a referral in April 2016 regarding allegations that Mother had been using heroin and was taking Child with her to conduct drug buys. Mother agreed to enter into a safety plan. In October 2016, CYS received another referral that Child's biological father assaulted Mother while she was holding Child and threatened to kill Mother's other child; Father was arrested, charged and pled guilty to simple assault and terroristic threats. Mother moved out of the family home and into maternal grandparents' residence with Child. Maternal grandparents agreed to supervise Mother's and Father's contact with Child. In November 2016, Child was placed in maternal grandparents' custody after Mother failed to follow the safety plan. On November 10, 2016, the court entered a shelter care order setting forth shared legal custody of Child between Mother and maternal grandparents, but directing that Child continue to reside in maternal grandparents' residence.

On December 12, 2016, Child was adjudicated dependent. CYS developed a permanency plan for Mother which included obtaining and maintaining housing and employment, drug and alcohol treatment, as well as domestic violence and mental health treatment. Mother made significant progress with her plan goals and Child was returned to her care on April 9,

where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."). Moreover, counsel indicated that Child does not understand the nature of the termination proceedings and "could not express his preferences." N.T. Termination Hearing, 1/11/19, at 57.

2018. However, on June 10, 2018, Mother relapsed on crystal methamphetamine while caring for Child. As a result, Child was placed in CYS' custody.[4] CYS caseworker Megan Wolfe testified that Mother made "minimal to no progress on [her goals]" after June 11, 2018. N.T. Termination Hearing, 1/11/19, at 11.

On September 19, 2018, CYS filed a petition for goal change. On December 21, 2018, CYS filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(2), (a)(5), (a)(8), and (b) of the Adoption Act.[5] CYS filed an amended termination petition on January 10, 2019, now including the need to address the special needs of Child and to cooperate with Mental Health-Intellectual & Development Disabilities (MH-IDD). **See** Amended Termination Petition, 1/10/19, at ¶ 10. On January 11, 2019, the trial court held a termination hearing during which Mother participated by telephone. Following the hearing, the court entered the instant decree involuntarily terminating Mother's parental rights[6] to Child. Mother filed a timely appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement of errors complained of on appeal.

Mother raises the following issues for our consideration:

---

[4] Maternal grandfather passed away suddenly three weeks before Child was placed in CYS' care. Maternal grandmother was unable to continue to care for him. N.T. Termination Hearing, 1/11/19, at 11.

[5] 23 Pa.C.S. §§ 2101-2938.

[6] The court also involuntarily terminated Father's parental rights to Child following the termination hearing. Father is not a party to this appeal.

> (1) Whether the trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of [Mother's] parental rights under [s]ection 2511(a) of the Adoption Act[.]
>
> (2) Whether the trial court abused its discretion and committed an error of law in determining it would be in the child's best interest to have parental rights terminated, when it failed to primarily consider the child's developmental, physical and emotional needs and welfare, thus contravening [s]ection 2511(b) of the Adoption Act[.]

Appellant's Brief, at 4.

We may not address the merits of Mother's appeal without first reviewing counsel's request to withdraw. *Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005). In *V.E.*, *supra*, our Court held:

> Counsel appointed to represent an indigent parent on a first appeal from a decree involuntarily terminating his or her parental rights, may, after a conscientious and thorough review of the record, petition the court for leave to withdraw representation if he or she can find no issues of arguable merit on which to base the appeal. Given the less stringent standard of proof required and the quasi-adversarial nature of a termination proceeding in which a parent is not guaranteed the same procedural and evidentiary rights as a criminal defendant, appointed counsel seeking to withdraw representation must submit an advocate's brief.

611 A.2d at 1275. In *In re Adoption of V.G.*, 751 A.2d 1174 (Pa. Super. 2000), our court reiterated the requirements counsel must satisfy before being permitted to withdraw in termination appeals: (1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined the appeal would be frivolous; (2) file a brief referring to any issues in the record of arguable merit; and (3) furnish a copy of the brief to the appellant and advise the appellant of his or her right to

retain new counsel or raise any additional points he deems worthy of this Court's review. *Id.* at 1176.

Instantly, counsel has complied with the withdrawal requirements outlined in *V.G.* He has filed a separate petition to withdraw concluding that the appeal would be frivolous, filed a brief referring to any issues of arguable merit, stated in his brief that he has furnished Mother with a copy of the brief, and informed her of her rights in lieu of counsel's representation. Therefore, we find counsel has substantially complied with the withdrawal requirements. *Commonwealth v. Wrecks*, 934 A.2d 1287 (Pa. Super. 2007) (substantial compliance is sufficient to satisfy withdrawal on appeal).

Moreover, based on our own independent review of the certified record, including the notes of testimony from the termination hearing, relevant case law and the trial court opinion, we agree with counsel's assessment that any appeal would be frivolous. Turning to the merits of the issues on appeal, we rely upon the March 19, 2019 opinion authored by the Honorable Christylee L. Peck to affirm the final decree terminating Mother's parental rights to Child under 23 Pa.C.S. §§ 2511(a) and (b). Judge Peck thoroughly and thoughtfully addresses the issues, concluding that: Mother has failed to overcome her drug addiction; Mother failed to appear for 82% of her scheduled drug screens; Mother does not have stable or appropriate housing for Child; Mother has not visited with Child in over two months; Mother had not sent Child any cards, gifts or letters at the time of the hearing; Mother does not ask the CYS caseworker about Child; Mother had missed more than half of her scheduled

visits with Child since June 2018; Child has a "very strong bond"[7] with his foster mother whom he calls "Mommy" and who is an adoptive resource;[8] Child is thriving emotionally, physically and socially in foster care;[9] and Child's guardian *ad litem* and CYS caseworker think termination is in Child's best interests in order to provide needed permanency and stability.[10]

We advise the parties to attach a copy of Judge Peck's decision in the event of further proceedings in the matter.

Decree affirmed. Counsel's petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/08/2019

---

[7] ***See*** N.T. Termination Hearing, 1/11/19, at 35.

[8] Foster mother indicated at the termination hearing that she would permit Mother to have contact with Child if Mother would do so on a consistent basis. ***Id.*** at 40-41.

[9] Foster mother also has a four-year-old foster daughter living with her family. Child refers to the foster daughter as his sister. ***Id.*** at 38.

[10] Attorney DeStefano has filed a letter indicting that he concurs with the trial court's decision to terminate Mother's parental rights.

IN THE INTEREST OF K.Q.,     : IN THE COURT OF COMMON PLEAS OF
     a Minor                  : CUMBERLAND COUNTY, PENNSYLVANIA
                                 :

Appeal of K.Q., Mother     : 106-ADOPTIONS-2018

## OPINION PURSUANT TO PA.R.A.P. 1925

Peck, J., March _19_, 2019 –

On November 7, 2016, K.Q. was placed in the custody of the maternal grandparents by verbal order of this Court, ratified and confirmed in an Order for Emergency Protective Custody on November 10, 2016.[1] At that time, K.Q. was placed in shelter care, keeping K.Q. in the physical custody of the maternal grandparents.[2] On December 12, 2016, K.Q. was adjudicated dependent.[3] On April 9, 2018, K.Q. was returned to the custody of Appellant following Appellant's cooperation with drug and alcohol treatment.[4] On June 11, 2018, an Emergency Modification of Placement Hearing was held following Appellant's drug relapse while caring for K.Q.[5] The child was placed in the custody of Cumberland County Children and Youth Services (CCCYS, or the Agency) the same day and thereafter placed in a foster home where he has since remained.[6] On September 19, 2018, the Agency, by and through its solicitor, Lindsay D. Baird, Esquire, filed a Petition for Goal Change Permanency Hearing to change the goal to adoption,[7] and an Amended Petition for Involuntary Termination of Parental Rights of Appellant on January 10, 2019.[8]

---

[1] CCCYS Exhibit No.1, Order for Emergency Protective Custody, November 10, 2016 (Peck, J.).
[2] CCCYS Exhibit No. 1, Master's Recommendation for Shelter Care, November 10, 2016 (adopted by this Court by Order dated November 15, 2016).
[3] CCCYS Exhibit No. 1, Master's Recommendation for Adjudication and Disposition – Child Dependent, December 12, 2016 (adopted by this Court by Order dated December 15, 2016).
[4] CCCYS Exhibit No. 1, Recommendation – Permanency Review, April 9, 2018 (adopted by this Court by Order dated April 12, 2018).
[5] CCCYS Exhibit No. 1, Recommendation Regarding Modification of Child's Placement, June 11, 2018 (adopted by this Court by Order dated June 14, 2018).
[6] Id.
[7] Petition for Goal Change Permanency Hearing, September 19, 2018.
[8] Amended Petition for Involuntary Termination of Parental Rights of K.Q. Under Section 2512 of the Adoption Act, January 10, 2019.

A Goal Change and Termination of Parental Rights Hearing was held on January 11, 2019.[9] Appellant did not appear for the hearing but participated by telephone. At the close of the hearing and on consideration of the evidence, this Court issued a Final Decree involuntarily terminating Appellant's parental rights.[10] On February 8, 2019, Appellant filed a Notice of Appeal and a Statement of Errors Complained of on Appeal, complaining that:

1. The Trial Court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of Appellant's parental rights under Section 2511(a) of the Adoption Act, 23 Pa.C.S.A. §2511(a).
2. The Trial Court abused its discretion and committed an error of law in determining it would be in the child's best interest to have parental rights terminated, when it failed to primarily consider the child's developmental, physical and emotional needs and welfare, thus contravening Section 2511(b) of the Adoption Act, 23 Pa.C.S.A. §2511(b).[11]

Pursuant to Pa.R.A.P. 1925(a), this Opinion is written in support of this Court's judgment.

## STATEMENT OF FACTS

a. <u>Background</u>

Appellant is the biological mother of K.Q., born in 2016. Agency involvement began in April of 2016 when the Agency received a referral based on concerns Appellant was

---

[9] <u>See</u> Re: Petition for Involuntary Termination of Parental Rights of K.Q. Under Section 2512 of the Adoption Act, Order of Court, December 26, 2018 (Peck, J.) (scheduling the hearing for January 11, 2019).

[10] Re: Amended Petition for Involuntary Termination of Parental Rights of K.Q. Under Section 2512 of the Adoption Act, Final Decree, January 11, 2019 (Peck, J.). This Court additionally terminated K.Q.'s biological father's parental rights involuntarily at that time. Father did not appear at the hearing. Re: Amended Petition for Involuntary Termination of Parental Rights of B.C. Under Section 2512 of the Adoption Act, Final Decree, January 11, 2019 (Peck, J.).

[11] Appellant's Statement of Errors Complained of on Appeal, February 8, 2019.

2

taking her children with her to purchase drugs.[12] Appellant informed the Agency at that time that she was using heroin.[13] In September of 2016, while Appellant was subject to an Agency Safety Plan related to her drug use, Appellant took the children and fled the home of her paramour, K.Q.'s biological father, due to domestic violence.[14] Appellant later returned to that home with the children.[15] In October of 2016, the Agency received a report that K.Q.'s biological father assaulted Appellant while she was holding K.Q. and threatened to kill one of Appellant's children.[16] The biological father was subsequently arrested and charged with simple assault.[17]

Appellant left the biological father's residence in October of 2016 and took her children with her to her parents' home, and the Agency created a new Safety Plan for K.Q., requiring the maternal grandparents to supervise Appellant's (and the biological father's) contact with the child.[18] Appellant thereafter violated the Safety Plan in November of 2016 when she took K.Q. from the home without the supervision of the maternal grandparents.[19] On November 7, 2016, K.Q. was placed in the custody of the maternal grandparents, resulting from Appellant's failure to follow the Safety Plan, K.Q.'s exposure to domestic violence, and Appellant's continued drug use.[20] On November 10, 2016, K.Q. was placed in shelter care, and ordered to remain in the home

---

[12] Transcript of Proceedings, In Re: Petition for Involuntary Termination of Parental Rights, January 11, 2019, at 10 (Peck, J.) (hereinafter "N.T. at ___."); CCCYS Exhibit No. 2, Shelter Care Application, November 9, 2016.

[13] N.T. at 10.

[14] Id.; CCCYS Exhibit No. 2, Shelter Care Application, November 9, 2016.

[15] N.T. at 10. See also CCCYS Exhibit No. 2, Shelter Care Application, November 9, 2016.

[16] N.T. at 10, 24; CCCYS Exhibit No. 2, Shelter Care Application, November 9, 2016.

[17] N.T. at 10, 24; CCCYS Exhibit No. 2, Shelter Care Application, November 9, 2016. See also CCCYS Exhibit No. 9. The biological father pled guilty to one count of simple assault. N.T. at 24.

[18] N.T. at 10-11; CCCYS Exhibit No. 1, Order for Emergency Protective Custody, November 10, 2016 (Peck, J.).

[19] N.T. at 10-11; CCCYS Exhibit No. 1, Order for Emergency Protective Custody, November 10, 2016 (Peck, J.); CCCYS Exhibit No. 2, Shelter Care Application, November 9, 2016.

[20] CCCYS Exhibit No. 1, Order for Emergency Protective Custody, November 10, 2016 (Peck, J.); CCCYS Exhibit No. 1, Master's Recommendation for Shelter Care, November 10, 2016 (adopted by this Court by Order dated November 15, 2016).

of the maternal grandparents, where Appellant was also residing.[21] Appellant and her parents were to share legal custody of the child.[22]

On December 12, 2016, K.Q. was adjudicated dependent.[23] On April 9, 2018, K.Q. was returned to Appellant's custody after findings that Appellant showed cooperation with the Agency and progress toward sobriety through outpatient treatment.[24] However, on June 11, 2018, Appellant relapsed over the course of two days, triggering police involvement, and admitted to using crystal meth while K.Q. was in her care.[25] In the interim, Appellant's father passed away and Appellant's mother suffered a medical incident, making a kinship placement with them not possible.[26] K.Q. was placed in the legal and physical custody of the Agency, to be placed in a foster home where he has since remained.[27]

Throughout Agency involvement, the Permanency Plans in place each had the primary goal of reunification.[28] The Initial Family Service Plan was developed on June 27, 2016, with continuing revisions through August 23, 2018.[29] According to the Family Service Plan, as testified to by CCCYS caseworker Megan Wolfe, Appellant was expected to improve parenting skills, obtain and maintain stable housing, and obtain drug and alcohol, mental health, and domestic violence treatment.[30] As to the drug and alcohol goal, Appellant was, more specifically, directed to cooperate with drug screens through

---

[21] CCCYS Exhibit No. 1, Master's Recommendation for Shelter Care, November 10, 2016 (adopted by this Court by Order dated November 15, 2016).

[22] Id.

[23] CCCYS Exhibit No. 1, Master's Recommendation for Adjudication and Disposition – Child Dependent, December 12, 2016 (adopted by this Court by Order dated December 15, 2016).

[24] CCCYS Exhibit No. 1, Recommendation – Permanency Review, April 9, 2018 (adopted by this Court by Order dated April 12, 2018); N.T. at 11.

[25] CCCYS Exhibit No. 1, Recommendation Regarding Modification of Child's Placement, June 11, 2018 (adopted by this Court by Order dated June 14, 2018); N.T. at 11.

[26] N.T. at 11.

[27] CCCYS Exhibit No. 1, Recommendation Regarding Modification of Child's Placement, June 11, 2018 (adopted by this Court by Order dated June 14, 2018).

[28] CCCYS Exhibit No. 1, Initial Permanency Plan dated December 12, 2016, revised April 10, 2017, October 9, 2017, March 8, 2018, August 23, 2018, December 18, 2018.

[29] CCCYS Exhibit No. 3, Initial Family Service Plan dated June 27, 2016, revised November 10, 2016, April 10, 2017, October 9, 2017, March 8, 2018, August 23, 2018.

[30] N.T. at 13-14; CCCYS Exhibit No. 3, Initial Family Service Plan dated June 27, 2016, revised November 10, 2016, April 10, 2017, October 9, 2017, March 8, 2018, August 23, 2018.

Restorative Sanctions and complete a drug and alcohol evaluation and follow any recommendations.[31] Appellant made only minimal progress on these goals since her relapse in June of 2018, and the caseworker testified that Appellant essentially stopped participating in Agency services.[32]

On January 11, 2019, this Court held a Goal Change and Termination of Parental Rights Hearing.[33] At the close of the hearing and on consideration of the evidence, this Court issued a Final Decree involuntarily terminating Appellant's parental rights.[34]

### b. Appellant's Status at the Time of the Termination Hearing

Appellant has not obtained stable housing.[35] Appellant was residing with the maternal grandparents for part of the time they were caring for K.Q., but Appellant resided with various others throughout Agency involvement, including friends and a fiancé.[36] Appellant was living with K.Q.'s biological father in 2016 at the home of friends, where Appellant continued to reside until she relapsed in that residence and got "kicked out."[37] Most recently, Appellant was residing with a friend in Harrisburg until she was "kicked

---

[31] CCCYS Exhibit No. 3, Initial Family Service Plan dated June 27, 2016, revised November 10, 2016, April 10, 2017, October 9, 2017, March 8, 2018, August 23, 2018.

[32] N.T. at 11, 25.

[33] See Re: Petition for Involuntary Termination of Parental Rights of K.Q. Under Section 2512 of the Adoption Act, Order of Court, December 26, 2018 (Peck, J.) (scheduling the hearing for January 11, 2019).

[34] Re: Amended Petition for Involuntary Termination of Parental Rights of K.Q. Under Section 2512 of the Adoption Act, Final Decree, January 11, 2019 (Peck, J.).

[35] N.T. at 14.

[36] CCCYS Exhibit No. 1, Master's Recommendation for Shelter Care, November 10, 2016 (adopted by this Court by Order dated November 15, 2016) (living with parents); CCCYS Exhibit No. 1, Master's Recommendation for Adjudication and Disposition – Child Dependent, December 12, 2016 (adopted by this Court by Order dated December 15, 2016) (living with parents); CCCYS Exhibit No. 1, Judicial Conference Report, March 6, 2017 (living with parents); CCCYS Exhibit No. 1, Recommendation – Permanency Review, November 9, 2017 (adopted by this Court by Order dated November 16, 2017) (living with fiancé); CCCYS Exhibit No. 1, Judicial Conference Report, February 1, 2018 (living with fiancé); N.T. at 14-15 (living with friends in 2016 through 2018 until relapse).

[37] N.T. at 14. For some portion of this period, Appellant resided with her parents. CCCYS Exhibit No. 1, Master's Recommendation for Shelter Care, November 10, 2016 (adopted by this Court by Order dated November 15, 2016) (living with parents); CCCYS Exhibit No. 1, Master's Recommendation for Adjudication and Disposition – Child Dependent, December 12, 2016 (adopted by this Court by Order dated December 15, 2016) (living with parents); CCCYS Exhibit No. 1, Judicial Conference Report, March 6, 2017 (living with parents).

out" in November of 2018 because of the friend's disapproval of the children living there.[38] At the time of the termination hearing, Appellant was residing at the friend's home in Harrisburg without the children.[39] Appellant did testify that she plans to move back in with her mother.[40]

Appellant failed to meet her drug and alcohol goals.[41] At the time of initial Agency involvement in November of 2016, Appellant reported that she was using heroin.[42] By December of 2016, Appellant obtained a drug and alcohol evaluation and was participating in outpatient treatment, but was not consistently appearing for Restorative Sanctions drug screens.[43] By March of 2017, Appellant had stepped down from intensive outpatient drug treatment to standard outpatient, but was unsuccessfully discharged from Restorative Sanctions drug screens for failing to comply.[44] In May of 2017, Appellant was unsuccessfully discharged from outpatient treatment.[45] By September of 2017, Appellant had not yet obtained a renewed drug and alcohol evaluation since her unsuccessful discharge.[46] By November of 2017, Appellant had obtained a renewed evaluation but was not providing regular drug screens.[47]

In April of 2018, Appellant showed successes in her drug treatment and K.Q. was returned to her care.[48] Appellant had been sober for three months,[49] was again moving from intensive outpatient drug treatment to standard outpatient treatment, was having regular visits with K.Q., was in a stable relationship with her significant other, and

---

[38] N.T. at 15.

[39] Id.

[40] N.T. at 53.

[41] See N.T. at 15-16; CCCYS Exhibit No. 3, Family Service Plan dated August 23, 2018.

[42] N.T. at 10; CCCYS Exhibit No.1, Order for Emergency Protective Custody, November 10, 2016 (Peck, J.).

[43] CCCYS Exhibit No. 1, Master's Recommendation for Adjudication and Disposition – Child Dependent, December 12, 2016 (adopted by this Court by Order dated December 15, 2016).

[44] CCCYS Exhibit No. 1, Judicial Conference Report, March 6, 2017.

[45] See CCCYS Exhibit No. 1, Recommendation – Permanency Review, November 9, 2017 (adopted by this Court by Order dated November 16, 2017).

[46] CCCYS Exhibit No. 1, Judicial Conference Report, September 7, 2017.

[47] CCCYS Exhibit No. 1, Recommendation – Permanency Review, November 9, 2017 (adopted by this Court by Order dated November 16, 2017).

[48] See CCCYS Exhibit No. 1, Recommendation – Permanency Review, April 9, 2018 (adopted by this Court by Order dated April 12, 2018).

[49] N.T. at 14.

reunification services were in place.[50] Two months later, in June of 2018, Appellant relapsed with crystal meth while K.Q. was in her care.[51] K.Q. was consequently placed with the foster family where he has since remained.[52]

After Appellant's June 2018 relapse, Appellant was directed to appear for drug screens 47 times, 39 of which were no-shows, and 8 were negative screens.[53] In September of 2018, the caseworker made a referral to the RASE Project's Recovery Specialist Program for Appellant to obtain drug recovery support, but Appellant did not follow through.[54] At the time of the Permanency Review Hearing on September 10, 2018, Appellant reported that she understood she needed to provide negative drug screens for the Agency, but stated she has "checked items off her list only to be given new items to complete."[55] Juvenile Court Hearing Officer Kate Lawrence accurately reminded Appellant that "demonstrated sustained sobriety is [the] biggest checkbox for her to fill, and it remains outstanding as an objective."[56]

The Agency raised no issues as to the mental health and domestic violence goals at the termination hearing. Initial Agency involvement stemmed, in part, from domestic violence in the home when Appellant was residing with K.Q.'s biological father. Appellant consistently maintained throughout Agency involvement that she was not interested in seeking domestic violence services in response to K.Q.'s past exposure to domestic violence while in her care.[57] By April of 2018, when K.Q. was returned to

---

[50] CCCYS Exhibit No. 1, Recommendation – Permanency Review, April 9, 2018 (adopted by this Court by Order dated April 12, 2018).
[51] CCCYS Exhibit No. 1, Recommendation Regarding Modification of Child's Placement, June 11, 2018 (adopted by this Court by Order dated June 14, 2018).
[52] Id.
[53] N.T. at 16.
[54] Id. The RASE Project is a non-profit organization based in Central Pennsylvania that serves individuals in recovery or seeking to recover from addiction. The RASE Project's Recovery Specialist Program provides individual drug recovery coaching.
[55] CCCYS Exhibit No. 1, Recommendation – Permanency Review, September 10, 2018 (adopted by this Court by Order date September 14, 2018).
[56] Id.
[57] See CCCYS Exhibit No. 1, Master's Recommendation for Adjudication and Disposition – Child Dependent, December 12, 2016 (adopted by this Court by Order dated December 15, 2016); CCCYS Exhibit No. 1, Judicial Conference Report, March 6, 2017; CCCYS Exhibit No. 1, Judicial Conference

Appellant's custody, the Agency was satisfied that Appellant was addressing any domestic violence needs through her drug and alcohol treatment and through the support of her extended family, and was comforted by Appellant's then-existing stable relationship with her then-fiancé.[58]

Appellant did not meet her parenting goal. Appellant stopped parenting services when K.Q. was returned to her in April of 2018 before her relapse and was discharged unsuccessfully for failure to complete services.[59] At the time of the termination hearing, Appellant's contact with the child was dwindling. Since June of 2018, Appellant attended seven visits with K.Q. and missed eight, which were all no-shows.[60] In August, Appellant was placed on call-ahead status because of her no-shows, and then switched to every-other-week visits in October of 2018 for the same reason.[61] At the time of the termination hearing on January 11, 2019, Appellant had not visited with K.Q. since November 12, 2018.[62] A December visit was scheduled but Appellant was a no-show.[63] Appellant does not ask about K.Q. or how he is doing when she speaks with the caseworker.[64]

Appellant ultimately failed to meet the most urgent goals the Agency created for her to reunite with K.Q.

c. <u>K.Q.'s Status at the Time of the Termination Hearing</u>

K.Q. just turned three years old and has lived with his foster family for over eight months.[65] He is a well-adjusted, happy child, and has a strong and trusting bond with his

---

Report, September 7, 2017; CCCYS Exhibit No. 1, Recommendation – Permanency Review, November 9, 2017 (adopted by this Court by Order dated November 16, 2017).

[58] CCCYS Exhibit No. 1, Recommendation – Permanency Review, April 9, 2018 (adopted by this Court by Order dated April 12, 2018).

[59] N.T. at 14.

[60] N.T. at 7.

[61] Id.

[62] N.T. at 8.

[63] Id.

[64] N.T. at 34.

[65] N.T. at 25, 37. See also CCCYS Exhibit No. 1, Recommendation Regarding Modification of Child's Placement, June 11, 2018 (adopted by this Court by Order dated June 14, 2018).

foster family.[66] K.Q. calls the foster mother, "mommy,"[67] and the family is a permanent, adoptive resource for K.Q.[68] The foster family has another foster child, a four-year-old daughter, who became part of their family a month after K.Q.'s placement.[69] The two are "thick as thieves," and call each other "brother and sissy."[70] K.Q. visits with his biological sister about once per month through the coordination of the children's respective foster families.[71] The foster mother is willing to continue contact with the biological parents in the future, but noted her concerns with the disappointment K.Q. suffers with inconsistency in visits; she testified, "it really does upset him" when people don't show up for him.[72] The foster mother has mailed Appellant photos of K.Q. on outings with the foster family, but Appellant has never responded or contacted the family.[73]

The foster family does developmental tracking with K.Q. to ensure he is healthy and developmentally on track, and to obtain any necessary services should a need arise.[74] The foster mother has sought therapy for K.Q., but could not locate any providers in the area to treat a child under three years old (K.Q. was two years old at the time of the hearing).[75] The foster mother testified that K.Q. has "exploded" in his personality since he was initially placed with the family, and is presently a happy and outgoing child.[76]

## DISCUSSION

a. Sufficiency of Evidence of Statutory Ground Under 23 Pa.C.S. § 2511(a)

This Court begins by addressing the standard of review applicable to Appellant's claims. Pennsylvania appellate courts "adhere[] to the view that the trial court is in the

---

[66] N.T. at 25, 35, 38.
[67] N.T. at 42.
[68] N.T. at 25.
[69] N.T. at 38.
[70] Id.
[71] N.T. at 33.
[72] N.T. at 40.
[73] N.T. at 43.
[74] N.T. at 38.
[75] N.T. at 44-45.
[76] N.T. at 44.

9

best position to determine credibility, evaluate the evidence, and make a proper ruling." In re R.I.S., 36 A.3d 567, 572 (Pa. 2011) (internal citations omitted). Absent an abuse of discretion or error of law, where the trial court's findings are supported by competent evidence, an appellate court must affirm the trial court even though the record could support the opposite result. In the Interest of R.J.T., 9 A.3d 1179, 1190 (Pa. 2010). Pennsylvania courts have held that "an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012) (internal citations omitted).

When evaluating a petition for termination of parental rights, a court must conduct a two-part analysis. First, a court must determine if the Agency has proven that at least one of the statutory grounds of termination set out in 23 Pa.C.S. § 2511(a) has been met. See In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) (*en banc*). Second, the court must evaluate whether the termination is in the best interest of the child, as required by 23 Pa.C.S. § 2511(b). Id. The burden is on the Petitioner to prove by clear and convincing evidence[77] that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). Appellant argues that the Agency failed to meet the statutory grounds for termination of parental rights under 23 Pa.C.S. § 2511(a) and (b).

The fulfillment of any one subsection of Section 2511(a) satisfies a threshold sufficient for a court to proceed to evaluate the best interests of the child under Section 2511(b). In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) (*en banc*). The Agency alleged in its Petition the following grounds under Section 2511(a) to terminate Appellant's parental rights:

---

[77] "Before terminating a parent's rights, the trial court must receive testimony 'that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" In re Adoption of A.C., 162 A.3d 1123, 1133 (Pa. Super. 2017) (quoting *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994)).

I.      23 Pa.C.S.A 2511 a (2): The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

II.     23 Pa.C.S.A 2511 a (5): The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best service the needs and welfare of the child.

III.    23 Pa. C.S.A 2511 a (8): The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.[78]

In this case, K.Q. was removed from Appellant's care on November 7, 2016, over two years prior to the termination hearing on January 11, 2019.[79] The conditions that led to the removal of K.Q. from Appellant's care continue to exist; initial Agency involvement stemmed in part from Appellant's drug use, and Appellant has since failed to demonstrate sustained sobriety. The Family Service Plan created to help Appellant reunify with the child directed Appellant to remain drug-free and cooperate with drug screens.[80] When K.Q. was returned to Appellant's care for just 2 months after being removed from her custody for 17 months, Appellant relapsed while caring for the child, and the child was

[78] Amended Petition for Involuntary Termination of Parental Rights of K.Q. Under Section 2512 of the Adoption Act, January 10, 2019.
[79] CCCYS Exhibit No. 1, Order for Emergency Protective Custody, November 10, 2016 (Peck, J.); CCCYS Exhibit No. 1, Master's Recommendation for Shelter Care, November 10, 2016 (adopted by this Court by Order dated November 15, 2016).
[80] CCCYS Exhibit No. 3, Initial Family Service Plan dated June 27, 2016, revised November 10, 2016, April 10, 2017, October 9, 2017, March 8, 2018, August 23, 2018. See also N.T. at 13-16.

11

thereafter removed for another 7 months at the time of the termination hearing.[81] Appellant has failed to consistently appear for drug screens, and since her June 2018 relapse, she missed 39 of 47 screens.[82] Parents have "an affirmative duty" to work toward reunification, which, "at minimum, requires a showing by the parent of a willingness to cooperate with the agency to obtain the rehabilitative services necessary for the performance of parental duties and responsibilities." In re Julissa O., 746 A.2d 1137, 1141 (Pa. Super. 2000) (internal quotations and citations omitted).

Appellant's demonstrated efforts to reunite with the child are unfortunately diminished by her lack of contact in recent months with K.Q. Since June of 2018, Appellant missed eight visits and attended seven, was placed on call-ahead status for no-shows, and had not visited with K.Q. for two months at the time of the termination hearing.[83] Appellant's housing has likewise been unstable and continuously changing in contravention of the Family Service Plan.[84] Appellant has voiced her insistence that she has done everything the Agency asks of her and that the Agency continues to give her more tasks (goals) to complete. Agency records and testimony submitted at the termination hearing belie this argument. While we sympathize with Appellant regarding the difficult workload and seeming mountains to climb that family service plans can present to a parent, we nevertheless recognize that Appellant was told that her main goal was sobriety. Appellant, in the recent past, relapsed while caring for K.Q., and has failed

---

[81] CCCYS Exhibit No. 1, Order for Emergency Protective Custody, November 10, 2016 (Peck, J.) (removal); CCCYS Exhibit No. 1, Recommendation – Permanency Review, April 9, 2018 (adopted by this Court by Order dated April 12, 2018) (return to Appellant); CCCYS Exhibit No. 1, Recommendation Regarding Modification of Child's Placement, June 11, 2018 (adopted by this Court by Order dated June 14, 2018) (second removal).

[82] N.T. at 16. See also CCCYS Exhibit No. 3, Family Service Plan dated August 23, 2018 (showing the goal was unmet at that time).

[83] N.T. at 7-8.

[84] N.T. at 14; CCCYS Exhibit No. 1, Master's Recommendation for Shelter Care, November 10, 2016 (adopted by this Court by Order dated November 15, 2016) (living with parents); CCCYS Exhibit No. 1, Master's Recommendation for Adjudication and Disposition – Child Dependent, December 12, 2016 (adopted by this Court by Order dated December 15, 2016) (living with parents); CCCYS Exhibit No. 1, Judicial Conference Report, March 6, 2017 (living with parents); CCCYS Exhibit No. 1, Recommendation – Permanency Review, November 9, 2017 (adopted by this Court by Order dated November 16, 2017) (living with fiancé); CCCYS Exhibit No. 1, Judicial Conference Report, February 1, 2018 (living with fiancé); N.T. at 14-15 (living with friends in 2016 through 2018 until relapse).

12

to demonstrate sustained sobriety since that time. She has not maintained stable housing or appeared for half of the scheduled visits with K.Q.

Termination of parental rights best serves the needs and welfare of K.Q. K.Q. just turned three years old. He has spent the vast majority of his young life outside Appellant's custody; the most stable facet of his circumstances has been the periods outside of Appellant's care. K.Q. spent 17 months in his grandparents' custody, interrupted by 2 months in Appellant's custody before his emergency removal. At the time of the termination hearing, K.Q. had spent 7 months in the care of his foster family, where he is happy and bonded to his family, and "thick as thieves" with his foster sister, who K.Q. terms his "sissy."[85] In his placement now, which is an adoptive resource, K.Q. is a happy and outgoing child.[86] K.Q.'s best interests lie in the same place where his personality has "exploded"[87] and his safety and stability are secured and prioritized. As the foster mother testified, it upsets the child when people don't show up for him.[88] This Court agrees with that sentiment. The Agency has satisfied Section 2511(a)(8).[89]

The Agency additionally satisfied Section 2511(a)(5). Appellant was directed, throughout Agency involvement, to appear for drug screens to demonstrate sobriety and allow for reunification with the child. At the time of the termination hearing, K.Q. had been out of Appellant's custody for a total of two years, interrupted by only two months in Appellant's care before her relapse, at a time when he was less than three years old.

---

[85] N.T. at 25, 35, 38.

[86] N.T. at 44.

[87] Id.

[88] N.T. at 40.

[89] It should be noted that 23 Pa.C.S. § 2511(a)(8) requires that "12 months or more have elapsed from the date of removal or placement." 23 Pa.C.S. § 2511(a)(8). K.Q. spent 17 consecutive months removed from Appellant's custody, followed by 2 months in her custody, followed by an additional 7 months out of Appellant's custody at the time of the termination hearing. CCCYS Exhibit No. 1, Order for Emergency Protective Custody, November 10, 2016 (Peck, J.) (removal); CCCYS Exhibit No. 1, Recommendation – Permanency Review, April 9, 2018 (adopted by this Court by Order dated April 12, 2018) (return to Appellant); CCCYS Exhibit No. 1, Recommendation Regarding Modification of Child's Placement, June 11, 2018 (adopted by this Court by Order dated June 14, 2018) (second removal). This Court finds no binding authority to suggest that the statute's requisite 12 months must be the most recent removal period rather than a 12-month period from initial removal. Instead, the spirit of Section 2511 sounds in the child's best interests, which would be disturbed by permitting a biological parent to foil application of Section 2511(a)(8) with a short spurt of custody in the midst of a long period of removal—here, two years total. The statute is designed to prevent children from languishing in foster care.

13

Before and after Appellant's relapse, Appellant failed to appear for the vast majority of her drug screens or otherwise demonstrate sustained sobriety or commitment to reunification through dedication to the goals that would allow her to do so. This Court is therefore without confidence Appellant can or will remedy the conditions leading to Agency involvement or, at a minimum, take advantage of the services designed to allow her to demonstrate the same in a reasonable time. The Agency therefore satisfied Section 2511(a)(5). Finally, the Agency also satisfied Section 2511(a)(2). Appellant's unwillingness or inability to demonstrate sobriety, maintain stable housing, or show commitment to appropriate parenting or maintaining contact with K.Q. in the two years since K.Q.'s initial removal from her care has left K.Q. without essential parental care that he requires.

With at least one of the statutory grounds met pursuant to 23 Pa.C.S. § 2511(a), this Court turned to Section 2511(b)—whether termination serves the best interests of the child, as discussed *infra*.

b. Sufficiency of Evidence that Termination of Parental Rights was in the Child's Best Interest Under 23 Pa.C.S. § 2511(b)

Appellant's next and final issue complained of on appeal is whether this Court erred in its analysis pursuant to 23 Pa.C.S. § 2511(b).[90] Section 2511(b) requires that this Court determine whether termination is in the best interests of the child. A trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). See also In re B.L.W., 843 A.3d 380, 384 (Pa. Super. 2004) (*en banc*) (outlining the two-step analysis). Furthermore, "the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S. § 2511(b). Pennsylvania appellate courts have stated that the emotional needs and welfare of the child have properly been interpreted to include

---

[90] Appellant's Statement of Errors Complained of on Appeal, February 8, 2019.

14

"intangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). When making a Section 2511(b) determination, the courts are to focus on the child, not the parent. In Re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*).

This Court is sympathetic to the passing of Appellant's father and to Appellant's mother's medical issues that developed during the course of Agency involvement. It is, however, K.Q.'s needs and best interests that must drive this Court's analysis. K.Q. is three years old. He has spent over two years outside of Appellant's custody in total. To date, Appellant has demonstrated an inability to sustain her sobriety or, at minimum, a commitment to demonstrating sobriety through drug screens or to appearing for visits with K.Q. to reunify with the child. K.Q.'s welfare and need for permanency cannot wait for Appellant to demonstrate the ability to care for him and prevent him from languishing in uncertainty where he has been for two years. Presently, K.Q. is bonded to his foster home, where he is outgoing and well-adjusted and his needs are being carefully and lovingly met. His foster mother is committed to his safety, security, and development, and is sensitive to his emotional needs. K.Q.'s well-being is secured and prioritized in his foster home, an adoptive resource, and the bond with his foster "mommy" is strong.[91] The attorney for the child, Damien DeStefano, Esquire, deferred to the recommendation of the guardian *ad litem*, but noted that K.Q. is currently "happy and healthy" and bonded to his foster mother who he calls "mommy" and with his foster sister.[92] The guardian *ad litem*, Marylou Matas, Esquire, similarly reported that K.Q. is "doing very well where he is," noted the foster mother's commitment to caring for him, and recommended termination of Appellant's parental rights, particularly given the extended length of time K.Q. has spent outside of Appellant's custody and K.Q.'s need for permanency and stability.[93] This Court therefore concluded that termination was in the best interests of the child pursuant to 23 Pa.C.S. § 2511(b).

---

[91] N.T. at 57-58.
[92] N.T. at 57.
[93] N.T. at 57-58.

15

## CONCLUSION

This Court finds that termination of Appellant's rights was not in error. For the reasons articulated in the above Opinion, this Court respectfully requests the Superior Court of Pennsylvania to affirm this Court's order granting the Agency's Petition for Involuntary Termination of Parental Rights of Appellant.

BY THE COURT,

_____
Christylee L. Peck,    J.

Joseph Hitchings, Esq.
5000 Ritter Road, Suite 202
Mechanicsburg, PA 17055
Attorney for Appellant/Mother

Marylou Matas, Esq.
39 West Main Street
Mechanicsburg, PA 17055
Guardian *ad litem*

Lindsay Baird, Esq.
Cumberland County Children & Youth Services
16 West High Street, Suite 200
Carlisle, PA 17013
Solicitor for CCC&YS

16